UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
EDDIE MENDOZA,                           :

                Plaintiff,       :

        -v-                             **REPORT & RECOMMENDATION**

                       :       **09 Civ. 5162 (PGG)(MHD)**

MICHAEL J. ASTRUE,                       :
Commissioner of Social Security,

                   :

              Defendant.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**TO THE HONORABLE PAUL G. GARDEPHE, U.S.D.J.:**


     Plaintiff Eddie Mendoza filed this <u>pro se</u> action pursuant to
sections 205(g) and 1631(c)(3) of the Social Security Act ("the
Act"), as amended, 42 U.S.C. §§ 405(g), 1383(c)(3).[1] He challenges
the April 7, 2009 decision of the Commissioner of Social Security
denying his April 13, 2004 application for Supplemental Security
Income ("SSI") and disability insurance benefits ("DIB"). (Compl.
¶¶ 8-9). Plaintiff seeks an order modifying the Commissioner's
determination, granting him monthly maximum insurance and/or SSI
benefits retroactively to the date of his claimed initial
disability, April 5, 2004, or alternatively an order remanding his
claim for reconsideration of the evidence. (<u>Id.</u> "Prayer for
Relief").

---

    [1] <u>See</u> Complaint, May 13, 2009, Doc. #2.

The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.[2] He asserts that his denial of SSI and DIB was supported by substantial evidence. (Def.'s Mot. 1, 18-25).

For the reasons set forth below, we recommend that defendant's motion for judgment on the pleadings be DENIED in its entirety, and the case remanded for further development of the record by the Commissioner.

## PROCEDURAL HISTORY

On April 13, 2004, plaintiff filed an application for DIB under Title II of the Act and SSI under Title XVI of the Act. (Admin. R. Tr. ("Tr.") 16, 56-59, 837-40). The Social Security Administration ("SSA") denied his application on initial review in August 2004 on the basis that plaintiff's condition was "not severe enough to keep [him] from working." (Tr. 38-43).

On September 1, 2004, plaintiff requested a hearing on his

---

[2] See Defendant's Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, July 14, 2010, Doc. #10 ("Def.'s Mot.").

application before an Administrative Law Judge ("ALJ"). (Tr. 46).
The hearing was initially scheduled for December 20, 2005 but was
rescheduled for December 23, 2005 for unspecified reasons. (Tr.
48). The December 23, 2005 hearing was also adjourned due to
transportation issues. (Tr. 841-43). A June 5, 2006 hearing was
also not completed for undisclosed reasons. (Tr. 52, 844-46). On
January 30, 2007 a hearing addressing preliminary matters was held
before ALJ Martha R. Reeves. (Tr. 869-78). On February 27, 2007 a
video-teleconference was held before ALJ Reeves at which a
vocational expert appeared to testify. (Tr. 879-89). However,
plaintiff was not on notice that a vocational expert would be
testifying, so this hearing was adjourned and rescheduled. (Id.).

On May 9, 2007 ALJ Leonard Olarsch conducted a hearing
regarding the substance of plaintiff's claims for SSI and DIB. (Tr.
23-30, 847-868). On August 17, 2007, ALJ Olarsch issued a decision
unfavorable to plaintiff. (Tr. 13-22). Though he found that
plaintiff had severe impairments that prevented him from performing
his prior relevant work as a factory machine operator --
specifically, asymptomatic HIV infection, lumbar spine disorder,
depressive disorder, and bipolar syndrome (Tr. 18) -- he determined
that plaintiff had the residual functional capacity to perform a
"wide range of light work." (Tr. 18-21). In light of plaintiff's

3

age, education, work experience, and residual functional capacity, ALJ Olarsch determined that jobs existed in significant numbers in the national economy that plaintiff could perform. (Tr. 22). Therefore, he concluded, plaintiff had not been under a disability as defined by the Act, and was not entitled to any benefits under the Act. (Id.).

On September 14, 2007, plaintiff filed a request for review of ALJ Olarsch's decision with the SSA Appeals Council. (Tr. 11). The SSA Appeals Council denied his request for review on April 7, 2009. (Tr. 6).

On May 13, 2009 plaintiff brought this pro se lawsuit requesting review of SSA's denial of benefits. (Compl. ¶¶ 1, 7-9). Plaintiff alleges that the ALJ's decision is erroneous because it is neither supported by substantial evidence on the record nor in accordance with the law. (Id. ¶ 9). Plaintiff seeks an award of maximum SSI benefits retroactive to April 5, 2004, the date of his alleged initial disability. (Id. Prayer for Relief). The Commissioner responded on July 14, 2009 by moving for judgment on the pleadings under Rule 12(c), asserting that the ALJ's decision is supported by substantial evidence. (Def.'s Mem. 1, 18-25).

**FACTUAL BACKGROUND**

I.   Medical Evidence Before the ALJ

The record reflects an extensive history of treatment for plaintiff's medical and psychiatric conditions.

   A.   Evidence Relating to the Period Prior to Plaintiff's
        Alleged Onset Date, April 5, 2004

On January 7, 2001 plaintiff visited the orthopedic clinic at Saint Vincent's Hospital and Medical Center ("St. Vincent's") complaining of lower back pain radiating down his right leg and a pins and needles sensation. (Tr. 168). On January 7, 2002 plaintiff returned to the clinic after being referred for pain shooting down the back of his right leg. (Id.). An examination revealed paresthesia,[3] full motor strength (5/5) bilaterally,[4] distal pulses[5]

---

[3] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." Dorland's Illustrated Medical Dictionary, 1324 (29th ed. 2000).

[4] Muscle strength is usually graded on a scale of zero to five, ranging from no visible muscle contraction (0) to normal strength (5). Merck Manual of Diagnosis and Therapy, 1751 (18th ed. 2006).

[5] "Distal pulses from all joints" refers to "the rhythmic expansion of an artery, palpable with the finger" at a "remote

from all joints, and a positive straight-leg-raise test.[6] (Id.). At that visit, plaintiff informed the clinician that he had fallen in 1997, and that he had experienced on-and-off lower back pain since then. (Id.). On that date, the clinic planned to take x-rays of plaintiff's spine. (Id.).

From June through December 2002, Nurse Practitioner ("NP") Monique Carasso saw plaintiff regularly for his HIV infection. (Tr. 157-67). During this period, his CD4[7] count ranged from 689 to 950. (Tr. 158, 160, 163, 165). His viral load[8] was assessed twice during this time period. On May 6, 2002 it measured 22,588 (Tr. 165) while

---

[location], farther from any point of reference." Dorland's, supra note 3, at 534, 1493.

[6] Muscle spasms or pain induced by straight leg raising may suggest inter-vertebral disc disease or other back problems, such as sciatica. Merck, supra note 4, at 325, 327.

[7] One's CD4 count is a predictor of the onset of serious opportunistic infections associated with AIDS. A normal CD4 count is $750/\mu L$ plus or minus $250/\mu L$. Generally, one's immunity is minimally affected if the CD4 count is greater than $500/\mu L$ and one's immunity becomes seriously impaired when the CD4 count falls below $200/\mu L$. Merck, supra note 4, at 1625-38.

[8] A patient's plasma may be tested for HIV RNA (viron) concentration, which is called the "viral load." Merck, supra note 4, at 1634. One's viral load "reflects HIV replication rates." Id. "For every 3-fold ($0.5 \log_{10}$) increase in viral load, mortality over the next 2 to 3 yr increases about 50%." Id. at 1635. Antiviral therapy is recommended for those with a CD4 count of less than $350/\mu L$ and a viral load of greater than 55,000 copies/mL. Id.

on July 23, 2002 it measured under 400. (Tr. 158, 160, 163).

Plaintiff next saw NP Carasso on March 10, 2003 (Tr. 155-57) and then did not see her again until September 4, 2003. (Tr. 151-54). During the September 4, 2003 visit, plaintiff indicated that he had stopped taking his HIV medications as of March 2003 because he felt that they were "making [him] sick." (Tr. 152). His HIV was asymptomatic. (Id.). Results from lab tests taken that date revealed a CD4 count of 407 and a viral load of 78,214. (Tr. 150). Plaintiff also continued to complain of low back pain radiating through his right thigh and foot (Tr. 152), but denied further pain or depression. (Id.). Plaintiff indicated that he had seen an orthopedist in the past, and that his pain had not worsened though it had not improved either. (Id.). He was not taking any over-the-counter medications for his pain, and he declined further referral to an orthopedist. (Tr. 152-53). NP Carasso planned to refer him to neurology for his spinal stenosis. (Tr. 153). His physical examination revealed a normal range of spinal motion and intact muscle strength. (Id.).

On September 25, 2003 plaintiff again saw NP Carasso. (Tr. 149-51). He complained of tooth pain. (Tr. 149-50). An examination revealed a lesion on plaintiff's upper left gum, for which NP

7

Carasso referred him to a dentist due to possible abscess (Tr. 150), and swollen lymph nodes. (Id.). Plaintiff reported that he was still not taking his HIV medication and stated that he did not wish to resume treatment due to "extreme" pill burden.[9] (Id.). His HIV was asymptomatic, and he denied any depression (Id.).

On November 13, 2003 plaintiff again saw NP Carasso. (Tr. 147-49). He indicated that he was not taking his antiretroviral medication ("ART")[10] but was willing to start again. (Id.). His most recent lab tests showed a CD4 count of 818 and a viral load of 150,268. (Tr. 148). NP Carasso noted that plaintiff had missed a neurological appointment for his back pain. (Tr. 147). NP Carasso's records also indicate that plaintiff "[w]ould like to apply for benefits." (Id.). Finally, plaintiff denied feeling depressed during the prior month. (Id.).

On December 12, 2003 plaintiff was examined by Dr. Michael Garofalo, a neurologist. (Tr. 144, 423). Plaintiff told Dr. Garofalo that for the past four years he had experienced lower back

---

[9] NP Carasso noted plaintiff was "extremely upset" when discussing his current HIV treatment regimen. (Tr. 150).

[10] Such medication aims to reduce an HIV patient's viral load and increase the patient's CD4 count, with the goal of suppressing viral replication. Merck, supra note 4, at 1635.

pain that radiated down his legs to his toes. (Id.). An examination revealed his motor strength was 5/5 throughout, his sensation was intact, his gait was normal and his deep tendon reflexes were 2+ throughout.[11] (Id.). Dr. Garofalo prescribed Neurontin[12] for plaintiff's pain, scheduled an MRI[13] of plaintiff's lumbar spine for December 22, 2003, and scheduled a follow-up visit for January 2004. (Id.).

On January 2, 2004 plaintiff saw Dr. Garofalo for a follow-up appointment. (Tr. 143, 422). Plaintiff continued to complain of lower back pain and shooting pain starting from his buttock and radiating to his feet. (Id.). His motor strength remained at 5/5, his gait remained normal, his deep tendon reflex remained 2+, and

---

[11] "Deep tendon (muscle stretch) reflex testing evaluates the afferent nerve, synaptic connections within the spinal cord, motor nerves, and descending motor pathways." Merck, supra note 4, at 1752. The modifier "2+" indicates that plaintiff showed a normal, brisk response. H. Kenneth Walker et al., Clinical Methods 365 (H. Kenneth Walker et al. eds., 3d ed. 1990).

[12] Neurontin, the brand name for the drug Gabapentin, is an anticonvulsant used as adjunctive therapy to treat seizures as well as anxiety, bipolar disorder, and chronic pain. Dorland's, supra note 3, at 721; Dan J. Tennenhouse, Attorneys' Medical Deskbook § 39:8 (4th ed. 2006-2011), available at Westlaw MEDDESK.

[13] MRI stands for Magnetic Resonance Imaging. Dorland's, supra note 3, at 1136. There is no original MRI in the record; however, multiple doctors were aware of and discussed the results in their medical notes. (E.g., Tr. 398).

a straight leg raise test was negative. (Id.). Dr. Garofalo reported that the MRI of plaintiff's lumbar spine revealed signal decrease[14] from L3-L4 and L5-S1, with questionable right S1 nerve root compression.[15] (Id.). Plaintiff was instructed to continue taking Neurontin and to begin taking Elavil.[16] (Id.).

In January of 2004 plaintiff saw NP Carasso twice. (Tr. 140-42, 145-47, 315-20). At both examinations he denied any depression during the month prior to each visit. (Tr. 140, 145, 315, 318). His HIV remained asymptomatic. (Tr. 141, 146, 315, 318). On January 5,

---

[14] "MRI interpretation depends chiefly on locating and characterizing signal abnormalities and deciding what alterations in tissue are causing these abnormalities. Much of this interpretation depends on MRI signal intensities, which range from very high ('bright' or 'white') to very low ('dark' or 'black'). The changes in signal intensity are based on tissue features and technical parameters used to image these tissues." Hemant Parmar & Jonathan D. Trobe, A "First Cut" at Interpreting Brain MRI Signal Intensities: What's White, What's Black, and What's Gray, 30 J. Neuro-Ophthalmology 91, 91 (2010).

[15] "S1" refers to the first sacral nerve, which emerges from the spine at the level of the sacrum. Tennenhouse, supra note 12, § 5:21. The sacrum is "the triangular bone just below the lumbar vertebrae." Dorland's, supra note 3, at 1593. "L3," "L4," and "L5" refer to the third, fourth, and fifth lumbar vertebrae, located in the lower spine. Tennenhouse, supra note 12, § 5:14. Nerve root compression is the entrapment of a nerve root. Dorland's, supra note 3, at 389.

[16] Elavil, the commercial name for amitriptyline, is "a tricyclic antidepressant . . . having sedative effects" that is used to treat chronic pain, among other ailments. Dorland's, supra note 3, at 63.

10

2004 plaintiff reported that he had undergone an MRI, and that neurology had prescribed him Neurontin and amitriptyline (Elavil). (Tr. 145, 318). He had self-discontinued Neurontin by that date because it made him dizzy. (Id.). On January 5, 2004 his most recent lab tests showed a CD4 count of 640 and a viral load of 1,904. (Tr. 145-46, 318-19). On January 26, 2004 his most recent CD4 count was 627 and his most recent viral load was 418. (Tr. 141, 316). By the later appointment plaintiff said he was feeling well. (Tr. 140, 316). He had resumed an ART regimen and had missed only one dose between appointments. (Tr. 141, 316).

On March 22, 2004 plaintiff saw NP Carasso with complaints of a non-productive cough, a runny nose, and nasal congestion. (Tr. 138). He reported that over-the-counter medications had done little to improve his symptoms. (Id.). An examination revealed slight rhonchi[17] in his lungs, but was otherwise unremarkable. (Tr. 139). His HIV was reported stable, and he denied feeling depressed during the prior month. (Tr. 138-39). NP Carasso's notes state that plaintiff was not on ART at the time of the visit and that he had reported missing one dose in the previous month because he had

---

[17] Rhonchi is the plural form of rhonchus, which is "a continuous sound consisting of a dry, low-pitched, snorelike noise, produced in the throat or bronchial tube due to a partial obstruction such as by secretions." Dorland's, supra note 3, at 1574-75.

failed to submit a timely refill. (Tr. 138). There is also a
"nursing discharge note" from the same visit that states that, when
speaking with an Eileen Wise, plaintiff denied missing any doses of
ART in the last thirty days. (Tr. 139). Finally, plaintiff
indicated that he had an appointment with Social Worker ("SW")
Larry Miller the same day because he planned to apply for benefits.
(Tr. 138).

        B.    Evidence Relating to the Period at Issue, April 5, 2004
            through August 17, 2007

        1.    Medical Treatment

On April 26, 2004 plaintiff again met with NP Carasso. (Tr.
134-36, 303-05). He reported that he had been unable to schedule a
dental appointment and complained that he thought the lump on the
roof of his mouth was growing. (Tr. 134, 303). He also reported
that he had quit his job due to stress and was applying for public
assistance and SSI. (Id.). His HIV was asymptomatic, his CD4 count
was 467, and his viral load was 3,167. (Tr. 135, 304, 710-11).
Plaintiff reported missing no ART doses in the previous 30 days.[18]
(Tr. 134, 303).

---

    [18] The record reflects "3 days," but based on NP Carasso's
other treatment files, this notation appears to be a typo.

12

Plaintiff attended a follow-up appointment with Dr. Garofalo on May 7, 2004 concerning his "low back pain" and pain radiating down both legs. (Tr. 133, 420-21). He complained that he woke up feeling drowsy in the mornings, but that his pain medication provided some pain relief. (Tr. 133, 420). Plaintiff indicated that he had been taking Neurontin and Elavil. (Id.). He denied any numbness or tingling. (Id.). His motor strength was 5/5, his deep tendon reflexes were 2+, and his sensation and gait were all normal. (Id.).

On June 14, 2004 plaintiff saw NP Carasso. (Tr. 130-31, 298-99). He expressed that his feet swelled sometimes, especially when he walked long distances. (Tr. 130, 298). NP Carasso noted that Dr. Garofalo had provided plaintiff with two prescriptions for disc herniation, Neurontin and another unidentified pain medication. (Id.). In addition, plaintiff had not started taking the "meds" that Dr. Shapiro had prescribed him because his insurance did not cover them at his pharmacy. (Id.). He was trying to get those prescriptions filled at a different establishment, the "SVCMC pharmacy." (Id.). Plaintiff expressed an interest in attending the VillageCare Center ("VCC")[19] day treatment program. (Tr. 130, 258,

_____

[19] "VillageCare is a community-based, not-for-profit organization serving persons living with HIV/AIDS, seniors and

298). Other than the persisting lesion on plaintiff's palate, his physical examination was normal. (Tr. 130-31, 298-99). Plaintiff's CD4 count was 534 and his viral load was 3,722. (Tr. 130-31, 299, 707, 709).

Plaintiff saw NP Carasso two weeks later for his annual HIV assessment. (Tr. 125-28, 292-95). He responded "yes" to both questions in the Whooley Depression Screen,[20] indicating that he felt depressed and anxious over the previous month. (Tr. 125, 292). He also noted that though he slept normally and felt well-rested, he awoke frequently during the night due to back and rectal pain. (Tr. 125, 293). He also complained of rectal itching and burning, for which he had visited an emergency room in the Bronx.[21] (Tr. 125, 292). While there, he was diagnosed with rectal ulceration. (Id.).

_____

individuals in need of continuing care and rehabilitation services." About Us, http://www.villagecare.org/about/ (last visited Nov. 30, 2011).

[20] The Whooley Depression Screen is comprised of two questions: (1) "During the past month, have you often been bothered by feeling down, depressed, or hopeless?" and (2) "During the past month, have you often been bothered by little interest or pleasure doing things?" (E.g., Tr. 764). Records indicate if a patient answers "yes" to both questions in the Whooley Depression Screen, the questioning doctor is to refer the patient to an HIV psychologist or a social worker for a follow-up evaluation. (E.g., id.).

[21] There is no record of this emergency room visit in the administrative transcript.

14

Additionally, plaintiff had suffered from diarrhea on at least one occasion and had suffered from rectal bleeding on at least two occasions. (Id.). His physical examination revealed a slight decrease in range of motion in his lower spine related to spinal stenosis. (Tr. 126, 293). Plaintiff reported taking Neurontin and ibuprofen for his pain. (Tr. 125, 292). NP Carasso also noted a persisting lump on plaintiff's soft palate and a possible ulceration of his rectal canal. (Tr. 126, 293). His gait and reflexes were normal and his sensation was intact. (Id.). His most recent labs, taken on June 14, 2004, showed his CD4 count was 600 and his viral load was 7,444. (Tr. 126, 294, 702-03).

On July 12, 2004 plaintiff was examined by Physician's Assistant ("PA") Rebecca Tinsman during a walk-in visit. (Tr. 286-88). He complained of constant rectal itching, burning, and of rectal bleeding after bowel movements. (Tr. 286). PA Tinsman took a culture and noted vesicular lesions on plaintiff's anus and rectal canal and some ulceration of the rectal canal. (Tr. 287). PA Tinsman prescribed plaintiff herpes medication, Valacyclovir (generic Valtrex), and scheduled a colorectal appointment. (Id.).

About two weeks later plaintiff saw PA Tinsman at a subsequent

15

walk-in appointment. (Tr. 280-81). He complained that his herpes persisted even after one week of treatment. (Tr. 280). PA Tinsman deemed his HIV treatment regimen effective and referred plaintiff to a hematologist for some abnormal blood findings.[22] (Tr. 281).

The next day plaintiff saw Dr. Christian Hirsch for a colorectal exam. (Tr. 414). A physical examination revealed an active herpectic lesion around his anus. (Id.). Dr. Hirsch ordered a barium enema and continued use of Valtrex for the active episode of herpes. (Id.). On August 2, 2004 plaintiff underwent the ordered barium enema. (Tr. 353). The results were negative. (Id.).

On August 12, 2004 plaintiff saw NP Carasso for a regular HIV/ART visit. (Tr. 275-78). His most recent labs showed that his CD4 count was 600 and his viral load was 11,321. (Tr. 276, 700). NP Carasso noted that plaintiff's CD4 count was high and his viral load was rising. (Tr. 277). NP Carasso also noted that plaintiff was scheduled to see a haematologist for abnormal blood findings, which included an elevated white blood cell ("WBC") count. (Id.).

_____

[22] The abnormal blood finding was "elevated PTT results," which refers to the results of a test called partial thromboplastin time ("PTT"). PTT measures "the coagulation factors of the intrinsic pathway of coagulation in plasma." Dorland's, supra note 3, at 1842.

16

Plaintiff requested medication to stimulate his appetite and help him gain weight. (Tr. 276). NP Carasso discussed plaintiff's diet and weight over the previous two years, and she started plaintiff on a trial of Marinol.[23] (Tr. 277). She also discontinued plaintiff's ART, referred him to SMART,[24] and considered alternative HIV treatments. (Id.). Lastly, NP Carasso noted that plaintiff had visited North Central Bronx Hospital for a rash and was diagnosed with "secondary syphilis," for which Dr. Gilbert in the "STD clinic" administered a penicillin injection.[25] (Tr. 276). Plaintiff was instructed to return for two additional shots over the next two weeks. (Tr. 277).

On August 17, 2004 plaintiff received the second penicillin injection. (Tr. 273). On this date, plaintiff also visited Dr. Capo

---

[23] Marinol, or dronabinol, is "used to treat the nausea and vomiting associated with cancer chemotherapy," Dorland's, supra note 3, at 545, 1061, and to treat anorexia in AIDS patients. Tennenhouse, supra note 12, § 40:16.

[24] SMART appears to be an alternative antiretroviral AIDS treatment. See, e.g., The SMART Way to Fight AIDS, U.S. Department of Health and Human Services, National Institute of Allergy and Infectious Diseases (Jan. 10, 2002) http://www.niaid.nih.gov/news/newsreleases/2002/pages/smart.aspx.

[25] There is no record of this emergency room visit in the file.

17

in the Cancer Center.[26]  (Id.).

On August 24, 2004 plaintiff saw Dr. Garofalo for a follow-up visit for his low back and radiculopathic pain. (Tr. 412-13). Dr. Garofalo found that plaintiff had full motor strength (5/5) throughout, suffered a mild sensory loss in his distal lower extremity, and had a normal gait. (Tr. 412). Dr. Garofalo referred plaintiff to physical therapy to improve his regional back pain. (Id.). He also lowered plaintiff's Elavil dosage and maintained his Neurontin dosage (Id.).

On September 20, 2004 plaintiff had a regular HIV/ART visit with NP Carasso. (Tr. 264-68). She diagnosed plaintiff with neurotic depression,[27] and noted he had an appointment that day with his psychiatrist, Dr. Shapiro. (Tr. 267). Plaintiff was not on ART at the time. (Id.). His CD4 count was 741 and his viral load was 32,468. (Tr. 266, 670, 681). NP Carasso ordered labs so that she could continue to monitor plaintiff's HIV. (Tr. 267). Plaintiff

---

[26] The record does not contain files from a Dr. Capo in the Cancer Center.

[27] Neurotic depression can refer to either any depression without psychotic features or a milder form of depression such as dysthymic disorder or reactive depression. Dorland's, supra note 3, at 477.

18

also complained that he was sleeping only three hours each night, that he had been worrying a lot, and that his mind was racing. (Tr. 266). Plaintiff also indicated that he had had a hematology appointment with Dr. Capo three days earlier for his elevated PTT. (Id.). Finally, plaintiff complained of a lump on his left testicle, for which NP Carasso ordered and discussed the results of a sonogram. (Tr. 266-67). The sonograph showed multiple parenchymal[28] and exophytic[29] cysts in plaintiff's left testicle. (Id.).

On November 8, 2004 plaintiff had another appointment with NP Carasso. (Tr. 261-63). He reported that the testicular mass was improving. (Tr. 262). He denied feeling depressed in the previous month. (Id.). His latest labs showed a CD4 count of 545 and a viral load of 250,000. (Tr. 262, 673, 675). Plaintiff was still not on ART. (Id.). NP Carasso noted that she had extensive discussions

---

[28] Parenchymal is something "pertaining to or of the nature of parenchyma." Dorland's, supra note 3, at 1324. The parenchyma are "the essential elements of an organ; used in anatomical nomenclature as a general term to designate the functional elements of an organ, as distinguished from its framework or stroma." Id.

[29] Exophytic means "growing outward; in oncology, proliferating on the exterior or surface epithelium of an organ or other structure, in which the growth originated." Dorland's, supra note 3, at 634.

with plaintiff about ART. (Tr. 263). Plaintiff was afraid of Fuzeon[30] injections, and informed NP Carasso that he would attempt to take Tipronavir instead.[31] (Id.).

On November 29, 2004 plaintiff saw NP Carasso and complained of a cough producing thick white sputum,[32] a two-day fever which had resolved itself, nasal and sinus congestion, and lower-abdominal pain. (Tr. 255-57). NP Carasso instructed plaintiff to take a decongestant and increase his fluid intake to combat his chronic sinusitis, spoke with him about modifying his diet in regards to his abdominal pain, and told him to return if his condition worsened or did not improve. (Tr. 256). Plaintiff was still not on an ART regimen. (Id.). She also noted that plaintiff continued to refuse "t-20."[33] (Id.). Plaintiff also reported trouble sleeping since his last visit with Dr. Shapiro, and said that his neighbor

---

[30] Fuzeon, the commercial name for enfuviritide t-20, is a fusion inhibitor that is used to treat HIV by stopping HIV from entering and infecting healthy cells. Merck, supra note 4, at 1637.

[31] Tipronavir is an antiretroviral drug, specifically a protease inhibitor, used to treat HIV by inhibiting the growth of HIV variants. Merck, supra note 4, at 1637.

[32] Sputum is "matter ejected from the lungs, bronchi, and trachea through the mouth." Dorland's, supra note 3, at 1687.

[33] "T-20" refers to Fuzeon injections. Merck, supra note 4, at 1637.

often disrupted his sleep. (Id.).

Plaintiff next saw NP Carasso on December 13, 2004. (Tr. 253-55). At this visit he agreed to begin Fuzeon treatment but noted that he had experienced mild neuropathy[34] from Zerit, an HIV medication that he had taken previously. (Tr. 254). Plaintiff said that his neuropathy had not improved despite discontinuing ART, so he was nervous to restart Zerit. (Id.). NP Carasso planned to review plaintiff's medical records to determine ART options appropriate for plaintiff that did not include Zerit. (Id.). She also ordered a follow-up sonograph for his testicular cysts. (Tr. 255). His latest CD4 count and viral load were 492 and 242,055 respectively. (Tr. 254).

Plaintiff saw Dr. Garofalo on December 28, 2004 for a follow-up appointment regarding his spinal stenosis. (Tr. 408-09). Plaintiff reported on-and-off pain, which he gave a score of about five out of ten. (Tr. 408). Plaintiff reported that his lower back

---

[34] Neuropathy is "[a] functional disturbance or pathological change in the peripheral nervous system, sometimes limited to noninflammatory lesions as opposed to those of neuritis; the etiology may be known or unknown. Known etiologies include complications of other diseases (e.g., diabetic . . . ) or of toxic states (e.g., arsenic . . . )." Dorland's, supra note 3, at 1212.

21

pain started when he fell playing basketball in 1997, and that the pain was persistent and gradually getting worse. (Id.). Dr. Garofalo diagnosed plaintiff with L5-S1 radiculopathy[35] and bilateral neuropathy secondary to AIDS. (Id.). He ordered plaintiff to continue his current pain-medication regimen, which included Neurontin. (Tr. 408-09).

On January 13, 2005 plaintiff had a regular HIV/ART visit with NP Carasso. (Tr. 241-43). He had been on the Fuzeon t-20 HIV treatment regimen for a week without difficulty. (Tr. 241). He reported some dizziness, diarrhea, and heartburn as a result of the new medications, but he reported that these symptoms had resolved themselves. (Id.).

Five days later, plaintiff had a walk-in visit with PA Tinsman for recurring penile lesions.[36] (Tr. 236-39). He reported that he had visited a different hospital's emergency room where they tested

---

[35] Radiculopathy is "[a] disease of the nerve roots." Dorland's, supra note 3, at 1511.

[36] The record states that this episode is a recurrence from last summer. (Tr. 237). PA Tinsman wanted to rule out syphilis as plaintiff had the same partner and showed the same symptoms. (Tr. 238).

him for sexually transmitted diseases and treated him for herpes.[37] (Tr. 237). PA Tinsman diagnosed plaintiff with penile lesions and thrush[38] and treated him accordingly. (Tr. 236-38).

Plaintiff next saw NP Carasso on February 3, 2005. (Tr. 231-33). He complained of diarrhea that had lasted for one week and itchy penile lesions. (Tr. 231). NP Carasso noted that his penile lesions, caused by genital herpes, were healing and that his diarrhea was most likely a side effect of his new ART regimen. (Tr. 232). Plaintiff also expressed that did not want to take the recently prescribed Depakote[39] because he felt he was already taking too many pills. (Tr. 231). His latest CD4 count and viral load were 506 and 2,603 respectively. (Tr. 232, 650-51).

---

[37] The administrative record does not contain records of this emergency room visit.

[38] Thrush is "candidiasis of the oral mucosa, usually the buccal mucosa and tongue, and sometimes the palate, gingivae, and floor of the mouth. It is characterized by white plaques of soft curdlike material that may be stripped off, leaving a raw bleeding surface." Dorland's, supra note 3, at 1837.

[39] Depakote, the commercial name for valproic acid, is an anticonvulsant most commonly used to treat neuropathic pain. Dorland's, supra note 3, at 476; Merck, supra note 4, at 1777-78. It is also used to treat "manic episodes associated with bipolar disorder." Dorland's, supra note 3, at 536.

23

Plaintiff again saw NP Carasso on February 24 and March 14, 2005. (Tr. 226-31). Aside from reporting that his appetite was stable, both examinations were unremarkable. (Id.). However, NP Carasso wrote that plaintiff had been diagnosed with Bipolar Disorder and was seeing Dr. Shapiro. (Tr. 228, 230). His most recent labs showed a CD4 count of 595 and a viral load of 3,167. (Tr. 227, 638).

On April 1, 2005 plaintiff attended a neurology follow-up appointment with Dr. Jesse Blumenthal. (Tr. 400, 440). Plaintiff complained of back pain and numbness in both feet that had begun about five years prior and worsened over the past year. (Tr. 400). He also complained of a shooting pain in his left leg. (Id.). Plaintiff's motor strength, gait, and deep tendon reflexes were all normal; however, plaintiff suffered a mild vibratory sensory loss.[40] (Id.). Dr. Blumenthal diagnosed plaintiff with a neuropathy related to his HIV and HIV medication, as well as a lumbar radiculopathy. (Id.). Dr. Blumenthal increased plaintiff's Neurontin and referred him to rehabilitation. (Tr. 400, 440).

---

[40] Vibratory sensory loss, or pallanesthesia, is loss of the "ability to feel the mechanical vibrations on or near the body, such as when a vibrating tuning fork is placed over a bony prominence." Dorland's, supra note 3, at 1306, 1622-23.

Two weeks later plaintiff saw NP Carasso and complained of bilateral foot and ankle pain that had lasted three weeks. (Tr. 222-24). She noted that plaintiff's spinal stenosis was stable on his current pain regimen. (Tr. 223). She informed plaintiff that certain medications in his ART regimen might be causing his foot pain and explained the potential risks and benefits of discontinuing those medications. (Id.). Plaintiff agreed to continue his current ART regimen, so NP Carasso planned to re-evaluate his symptoms at their next visit. (Id.). NP Carasso also advised plaintiff to return to the clinic if his symptoms worsened. (Id.).

On May 20, 2005 plaintiff met with Dr. Julian Sosner for an initial rehabilitation evaluation for back pain radiating down his left leg that had lasted five years. (Tr. 398). Plaintiff indicated that he had not tried physical therapy and that he exercised at the gym. (Id.). He also informed Dr. Sosner that he lived alone in a fourth-floor walk-up apartment. (Id.). Dr. Sosner assessed intermittent paresthesia of both feet and ankles and back pain radiating on plaintiff's left side and referred him to physical therapy. (Id.). Dr. Sosner also noted that plaintiff's MRI from December 2003 demonstrated disc degeneration, central disc

25

protrusion (L3-4, L5-S1) and possible compression of the right S1 nerve. (Id.). Plaintiff's strength was 5/5 globally, and he had no sensory deficits to light touch. (Id.). Dr. Sosner also noted that plaintiff had completed disability paperwork, and that a Dr. Sambatore had also completed related forms. (Id.).[41]

On May 27, 2005 plaintiff asked NP Carasso for a medical release so that he could play softball at VCC day treatment. (Tr. 827). She noted that she completed the release, but did not clear plaintiff to play softball due to his spinal stenosis. (Id.). She recommended that Neurology and the Department of Rehabilitation Medicine clear him to play.[42] (Id.).

Plaintiff next saw NP Carasso on June 20, 2005. (Tr. 824-27). He reported that he was feeling well and that he had been attending physical therapy twice weekly for his back pain.[43] (Tr. 825). He

---

[41] This is the only reference in the record to a Dr. Sambatore.

[42] It is unclear if plaintiff was ever released to play.

[43] The file contains physical therapy reports for June 9, 14, 16 and 21, 2005, in which plaintiff rated his pain as either a 3 or 4 out of 10. (Tr. 388-93). Plaintiff informed the physical therapist that walking increased his pain and that he was unable to participate in volleyball and softball during that time. (Tr. 388, 392).

26

also reported that he had started injecting t-20 into his buttock because he was experiencing site reactions from leg and abdomen injections. (Id.). He asked for an increase in Androgel (topical testosterone)[44] and reported that, although he still felt fatigued, he noticed minimal improvement. (Id.). He reported that he had not felt depressed in the prior month, and that he had only missed one dose of his medicine during that time because he was out without his medication. (Id.). His CD4 and viral load counts from June 9, 2005 were 701 and below 50 respectively. (Tr. 624-25, 826). NP Carasso assessed plaintiff's HIV as stable and recommended that plaintiff receive his t-20 injections at VCC until his site reactions resolved. (Tr. 826). She also recommended that plaintiff remain on Androgel for another month to treat his testicular cysts. (Id.).

Plaintiff again saw NP Carasso on July 21, 2005. (Tr. 822-23). Plaintiff indicated that Marinol helped his appetite but that it also altered his behavior, so he wanted to stop taking it. (Tr. 822). NP Carasso noted that plaintiff had lost ten pounds since

---

[44] "AndroGel, an androgen, is indicated for replacement therapy in adult males for conditions associated with a deficiency or absence of endogenous testosterone . . . ." Physicians' Desk Reference, 8278-0225 (64th ed. 2010) ("PDR"), available at Westlaw PDR.

December of 2004, and that this weight loss was noticeable in his face. (Id.). Plaintiff attributed the weight loss to diarrhea, which had persisted for the previous three weeks. (Id.). Plaintiff believed his diarrhea was the result of eating "street food." (Id.). NP Carasso noted that a recent testicular sonogram had revealed bilateral minute sized epididymal[45] cysts that remained relatively unchanged since plaintiff's prior examination and that the sonogram showed no presence of testicular masses. (Id.). She noted that plaintiff's HIV was stable ("doing well"). (Tr. 823). Finally, she prescribed plaintiff Cyproheptadine HCL[46] for his Cachexia.[47] (Id.).

On August 25, 2005 plaintiff returned to NP Carasso for a regular HIV/ART visit. (Tr. 818-21). Plaintiff told NP Carasso that he "sometimes" felt depressed, down, or hopeless during the past

---

[45] Epididymal means pertaining to "the elongated cordlike structure along the posterior border of the testis, whose elongated coiled duct provides for storage, transit, and maturation of spermatozoa and is continuous with the ductus deferens." Dorland's, supra note 3, at 606.

[46] Cyproheptadine HCL is used as an antihistaminic for relief of allergy symptoms or itching related to a skin disorder. Dorland's, supra note 3, at 445.

[47] Cachexia refers to "a profound and marked state of constitutional disorder; general ill health and malnutrition." Dorland's, supra note 3, at 261.

month. (Tr. 819). He complained that he had suffered from diarrhea three to four times a day. (Id.). NP Carasso noted that there were few WBCs in his stool. (Id.). She noted that plaintiff had lost weight and that he had consulted a nutritionist at VCC who recommended that he take supplements.[48] (Id.). She characterized plaintiff's HIV as stable. (Tr. 820). NP Carasso prescribed plaintiff Megace[49] for his Cachexia, Lotrisone[50] lotion for Onychia[51] of the toe and Ciprofloxacin[52] for his diarrhea. (Id.).

On September 15, 2005 plaintiff again saw NP Carasso. (Tr. 814-16). Plaintiff reported that he had increased his smoking habit to more than one pack per day. (Tr. 814). He had decided to lower his Megace dose because he had noticed a change in his appetite. (Id.). She also indicated that Ciprofloxacin had resolved his

---

[48] There is no report from the nutritionist in the record.

[49] Megace is used to treat anorexia, cachexia, and other significant weight loss in AIDS patients. PDR, supra note 44, at 6200-0510.

[50] Lotrisone is an antifungal and anti-inflammatory agent. Dorland's, supra note 3, at 207, 366, 1028.

[51] Onychia is an "inflamation of the matrix of the nail resulting in shedding of the nail." Dorland's, supra note 3, at 1263.

[52] Ciprofloxacin is an antibacterial medication. Dorland's, supra note 3, at 355.

diarrhea. (Id.). His most recent labs showed CD4 and viral load counts of 705 and less than 50 respectively. (Tr. 609-11, 815). NP Carasso also noted that plaintiff had an elevated WBC count and planned to repeat his lab tests the same day. (Tr. 815).

Plaintiff returned about a week later for treatment and evaluation for diarrhea and weight loss. (Tr. 812-14). He told NP Carasso that he had gone to the emergency room earlier in the week, where he was given intravenous ("IV") fluids and antibiotics but was not admitted.[53] (Tr. 813). He reported that he had discontinued his ART due to his diarrhea, which had decreased to three times daily. (Id.). NP Carasso advised plaintiff that he could resume ART. (Id.). She again changed plaintiff's treatment for Cachexia, prescribed Mylanta for his esophageal reflux, and referred plaintiff to a gastrointestinal specialist for further evaluation and a possible esophago-gastroduodenoscopy.[54] (Id.).

Plaintiff saw NP Carasso again on September 29, 2005. (Tr.

---

[53] The file does not include records from this emergency room visit.

[54] An esophago-gastroduodenoscopy is an "endoscopic examination of the esophagus, stomach," and the first part of the small intestine. Dorland's, supra note 3, at 550, 622.

30

810-12). Plaintiff brought a reduced metro-card fare application to
the visit. (Tr. 811). He told NP Carasso that he was aware that he
did not qualify for a reduced fare for medical reasons, but that he
wanted to bring the forms to Dr. Shapiro, as he hoped to qualify
based on his psychiatric diagnoses. (Id.).

Plaintiff still had not resumed his ART therapy. (Tr. 811-12).
He indicated that he was nervous about restarting ART, as he
worried that it would aggravate his diarrhea. (Tr. 811). He
reported that his diarrhea had improved from three to two times a
day, and that he had a gastroenterology appointment scheduled for
the following week. (Tr. 437, 811). NP Carasso again advised
plaintiff that he could resume ART. (Tr. 811). Finally, plaintiff
continued to present with Onychia of the toe. (Id.). He was to
continue to treat the Onychia with Lotrisome and schedule a
dermatological appointment if the condition did not resolve. (Id.).

Plaintiff saw Dr. Nicholas Gualtieri at St. Vincent's
Gastroenterology Clinic on October 4, 2005 for his persistent
diarrhea. (Tr. 381-82). Plaintiff reported that he was having three
loose bowel movements per day. (Tr. 381). He also complained of
heartburn, depressed appetite, and a twelve-pound weight loss over

the past month. (Id.). Dr. Gualtieri diagnosed chronic diarrhea that was either infectious or metabolic or irritable bowel syndrome and recommended a colonoscopy. (Tr. 382).

On October 17, 2005 plaintiff had another walk-in visit with PA Tinsman. (Tr. 808-09). He expressed concerns that his WBC count was elevated without explanation. (Tr. 808). Plaintiff indicated that he believed his elevated WBC count might be related to an ongoing herpes infection. (Id.). PA Tinsman reported penile lesions that looked somewhat fungal, took a herpes culture, a rapid plasma reagin,[55] and a complete blood count, and prescribed plaintiff Valtrex and Spectazole cream.[56] (Tr. 809).

On October 21, 2005 plaintiff saw Dr. Hon-Ming Eng, a gastroenterologist, at a follow-up visit for his diarrhea. (Tr. 379-80). He reported that his diarrhea had improved to two watery bowel movements a day. (Tr. 379). Dr. Eng ordered a colonoscopy for December 1, 2005. (Tr. 379, 463-64, 469, 477, 487-88). The results of the colonoscopy showed some internal hemorrhoids and moderate

---

[55] A rapid plasma reagin is a syphilis screening test. Dorland's, supra note 3, at 1811.

[56] Spectazole cream is an anti-fungal medication. Tennenhouse, supra note 12, § 40:22.

chronic inflamation consistent with intestinal spirochetosis,[57] but was otherwise unremarkable. (Tr. 469, 477, 487-88).

On December 5, 2005 plaintiff saw NP Carasso, who noted that his diarrhea had resolved. (Tr. 793-95). Plaintiff complained of tingling in his feet, but stated that he did not wish to alter his ART regimen. (Tr. 793). Plaintiff's HIV and weight were both stable. (Tr. 794). His CD4 and viral load, assessed on this date, were 504 and 11,976 respectively. (Tr. 566-67, 791). He also told NP Carasso that he wanted to enroll in Columbia Nursing School. (Tr. 793).

Plaintiff had a regular HIV/ART appointment with Dr. Rita Chow on February 8, 2006. (Tr. 790-92). Plaintiff informed Dr. Chow that he had stopped taking his ART medications approximately two months prior but wanted to resume therapy. (Tr. 790-91).

Dr. Chow saw plaintiff again two weeks later. (Tr. 787-90). Plaintiff indicated that he had not resumed his HIV medications as

---

[57] Intestinal spirochetosis is an "infection with spirochetes." Dorland's, supra note 3, at 1680. Spirochetes are a form of "spiral bacterium" or "a general term for any microorganism of the order Spirochaetales." Id. at 1679.

planned because he wanted to see the results of his blood work first. (Tr. 788). Plaintiff intended to resume his medications following the visit that day. (Tr. 789). He had no new complaints. (Tr. 788). His CD4 count was 536 and his viral load was 150,906. (Tr. 557-58, 788). Dr. Chow noted that plaintiff's CD4 was stable but that his viral load was "much elevated." (Tr. 789). Additionally, plaintiff was referred to dermatology for a fungal toenail infection. (Id.).

Plaintiff underwent surgery in March 2006 to repair a deviated septum.[58] (See, e.g., Tr. 227, 239, 246, 248, 260, 383, 399, 402, 404-05, 418, 439, 773, 788, 793, 795-96). Throughout 2004 and 2005 he underwent several medical examinations in order to obtain medical clearance for this procedure. (Id.).

Plaintiff's next appointment with Dr. Chow was on March 8, 2006. (Tr. 784-87). He reported that he had resumed taking his medications but that he was having difficulty tolerating the Fuzeon. (Tr. 784). Dr. Chow ordered blood work so that she could assess plaintiff's response to resuming his medication. (Tr. 786).

_____

[58] It is unclear what date in march, though plaintiff was still awaiting surgery as of March 8, 2006. (Tr. 781).

34

Plaintiff again saw Dr. Chow on April 5, 2006. (Tr. 781-83). His CD4 was 833 and his viral load was 2,623. (Tr. 545-46, 782). Dr. Chow noted that plaintiff showed a good virological response to resuming his medications. (Tr. 783). Plaintiff also presented with increased glucose in his metabolic panel,[59] so Dr. Chow ordered a fasting lipid profile on his next blood work. (Id.). Plaintiff reported that his nasal-septum surgery was a success and indicated noticeable improvement in his nasal breathing. (Tr. 781).

Plaintiff saw Dr. Dina Began, a dermatologist, on May 10, 2006 for a fungal toenail infection and itchy pimples on his arms and legs. (Tr. 779-80). She prescribed Lamisil for the fungal infection and triamcinolone 0.1% ointment[60] for his eczematous dermatitis.[61] (Tr. 780). She scheduled plaintiff for a follow-up in one month. (Id.).

On May 15, 2006 plaintiff had a subsequent appointment with

---

[59] A panel of blood tests that measure the level of glucose and other agents in a patient's blood. Tennenhouse, supra note 12, § 19:31.

[60] An anti-inflammatory steroid. Tennenhouse, supra note 12, § 40:23.

[61] Eczema. Dorland's, supra note 5, at 567.

Dr. Chow to address his elevated lipids. (Tr. 776-78). Dr. Chow noted that plaintiff's HIV was asymptomatic. (Tr. 776). She also noted that plaintiff had stopped taking his ART medications as per her May 11, 2006 telephone request. (Tr. 776, 778). Dr. Chow advised plaintiff to continue withholding his ART medication, modify his diet, and begin taking Tricor for his elevated lipids. (Tr. 778).

Plaintiff's next appointment with NP Carasso was on May 31, 2006. (Tr. 773-75). Plaintiff told NP Carasso that he had discontinued Fuzeon five months prior due to site reactions, dizziness, and nausea, and that he refused to restart Fuzeon treatment. (Tr. 773). NP Carasso noted that plaintiff was to otherwise resume his ART that day. (Tr. 774). Plaintiff also reported that he had not felt depressed in the prior month and indicated that his "pain score" was 0 out of 10. (Tr. 773). NP Carasso noted that plaintiff's hyperlipidemia had improved to within normal limits. (Tr. 774).

Plaintiff returned to NP Carasso on August 7, 2006 with complaints of bilateral foot pain. (Tr. 769-73). Plaintiff's self-assessed pain score was 7 out of 10. (Tr. 771). NP Carasso

36

prescribed Percocet for plaintiff's foot pain. (Tr. 772). He
indicated that he was taking Neurontin but that he had not tried
any other pain medications because of the side effects; plaintiff
did not like feeling sleepy or "out of it." (Tr. 771). He also
indicated that he had sometimes felt down, depressed or hopeless in
the past month because he did not like the side effects of his
"psych" medications. (Id.). Plaintiff finally noted that he had
missed only one dose of ART in the prior 60 days. (Id.). Plaintiff
also explained that he had missed many appointments because of his
recent move. (Id.).


On August 21, 2006 plaintiff again saw NP Carasso. (Tr. 764-
66). He complained that he was depressed and did not want to leave
his house. (Tr. 764). He answered yes to both questions in the
Whooley Depression Screen, but denied suicidal or homicidal
ideation. (Id.). He reported that Percocet helped his pain, which
he indicated as a two out of ten. (Id.). Plaintiff's most recent
labs showed his CD4 was 742 and his viral load was 130. (Tr. 765).
NP Carasso noted that plaintiff's triglycerides were elevated due
to Kaletra[62] and despite his taking Tricor. (Id.). She advised

---

[62] Kaletra "is indicated in combination with other
antiretroviral agents for the treatment of HIV-1 infection." PDR,
supra note 44, at 0040-2600.

plaintiff to discontinue his current ART regimen and consider a new regimen that included Prezista.[63] (Id.). For his continued foot pain, NP Carasso continued to prescribe Percocet and instructed that plaintiff follow up with neurology. (Id.).

On September 6, 2006 plaintiff had a regular HIV/ART visit with NP Carasso. (Tr. 751-53, 759-60). He reported that his depression was slightly improved and that he was considering anti-depressant therapy. (Tr. 752, 759). He again answered "yes" to both questions in the Whooley Depression Scale, indicating that he felt depressed during the prior month. (Id.). He also reported that he had discontinued his ART medications as instructed. (Id.). NP Carasso advised plaintiff to resume his ART treatment. (Tr. 752, 760). Additionally, plaintiff indicated a pain score of zero out of ten. (Tr. 752, 759).

On September 27, 2006 plaintiff saw NP Carasso. (Tr. 748-50). He complained of frequent urination and a sore throat. (Tr. 748). Plaintiff also reported some improvement in his depression. (Id.). His pain score was again a zero out of ten. (Id.). NP Carasso

---

[63] Prezista, or darunavir, is an "antiretroviral protease inhibitor." Tennenhouse, supra note 12, § 40:7.

described plaintiff's HIV as stable with low-level viremia.[64] (Tr. 749). She diagnosed a urinary tract infection, prescribed Cipro[65] and referred plaintiff to a urologist. (Id.).

On November 2, 2006 plaintiff had an appointment with Dr. Steven Kallet, a urologist. (Tr. 372-72A). Plaintiff complained of blood in his urine and rated his pain at a two out of ten. (Id.). Dr. Kallet scheduled plaintiff for a renal sonogram on November 9, 2006. (Id.).

Plaintiff next saw NP Carasso on November 8, 2006. (Tr. 744-46). He reported that he had been to the urologist and that his labs and urine cultures were pending. (Tr. 744). He reported that he was feeling well, and answered "no" to both questions in the Whooley Depression Screen. (Id.). He stated that he had taken some of the Wellbutrin[66] that Dr. Shapiro had prescribed, but had decided to discontinue it because the side effects made him anxious and

---

[64] Viremia is "the presence of viruses in the blood, usually characterized by malaise, fever, and aching of the back and extremities." Dorland's, supra note 3, at 1965.

[65] Likely a reference to Ciprofloxacin.

[66] Wellbutrin is the commercial name for bupropion hydrochloride, an antidepressant and a smoking-cessation aid. Dorland's, supra note 3, at 253, 1985.

aggravated his smoking. (Id.). He rated his pain as a two on a one-to-ten scale, and indicated that he was taking Percocet for back pain one to two times weekly. (Id.). His CD4 count was 768 and his viral load was 83. (Tr. 526, 745). NP Carasso explicitly noted plaintiff's low viral load. (Tr. 745).

Plaintiff's next appointment with NP Carasso was on January 10, 2007. (Tr. 741-44). He told her that he had traveled to Puerto Rico on December 18, 2006 and returned on January 8, 2007. (Tr. 741). He reported that he had forgotten his medications at home and had therefore missed three weeks of treatment during his trip. (Id.). He also reported that he had suffered from cold symptoms, including a sore throat and non-productive cough, for a week-and-a-half in Puerto Rico. (Id.). He reported no pain. (Id.). Additionally plaintiff requested an updated medical history and list of medications for a disability hearing scheduled later that month. (Id.).

On January 29, 2007 plaintiff again saw NP Carasso. (Tr. 735-37). He reported that his pain score was at a ten out of ten, that he was experiencing leg pain and neuropathy, and that he had not taken any pain medication. (Tr. 735). NP Carasso referred him to

40

Neurology to evaluate his neuropathy and continued to prescribe Percocet. (Tr. 736). He also complained of sinus and nasal congestion, a cough that had persisted for two weeks, a slight headache, and a mild sore throat. (Tr. 735). Plaintiff did not have a fever. (Id.). NP Carasso prescribed Zithromax for his acute sinusitis. (Tr. 736). She also changed his lipid medication to Lofibra. (Id.). NP Carasso noted that plaintiff's HIV was stable. (Id.). Finally, she documented that plaintiff had missed several hematology appointments and referred him again to hematology for an elevated WBC count. (Tr. 736-37).

On February 26, 2007 plaintiff had another appointment with NP Carasso. (Tr. 731-33). He reported that he had stopped taking lithium earlier that month because his hematologist thought it might be the cause of his Leukocytosis.[67] (Tr. 731). Prior to that, he was taking one dose orally per day. (Id.). Plaintiff informed NP Carasso that Dr. Shapiro believed it was unlikely that plaintiff's low dose of lithium caused his Leukocytosis. (Tr. 732). Plaintiff also complained of chronic sinusitis that persisted in spite of his nasal-septum surgery. (Tr. 731). NP Carasso directed plaintiff to

---

[67] Leukocytosis is "a transient increase in the number of [white blood cells] in the blood," resulting from various causes, such as fever or infection. Dorland's, supra note 3, at 984.

consult an ear, nose and throat specialist. (Tr. 733). Plaintiff
also complained of a rash from his shoulder to his biceps, for
which NP Carasso prescribed him some lotion. (Tr. 731-32). At this
visit, plaintiff reported no pain. (Tr. 731). NP Carasso indicated
that his neuropathy was stable and his HIV was stable with a low-
level viremia. (Tr. 732). Plaintiff's latest CD4 count was 836 and
his latest viral load was 289. (Id.). NP Carasso also noted that
hematology was monitoring his WBC count. (Id.).

Plaintiff's next visit with NP Carasso was on March 26, 2007.
(Tr. 728-30). He complained of a productive cough that had not
responded to over-the-counter remedies. (Tr. 728). A physical
examination revealed scattered rhonchi of the lungs. (Id.). She
diagnosed acute bronchitis and tobacco abuse and prescribed
Augmentin[68] and Nicoderm CQ respectively. (Tr. 729). Plaintiff
reported no pain. (Tr. 728). NP Carasso noted that plaintiff's HIV
was stable with low-level viremia. (Tr. 729).

Plaintiff's next visit with NP Carasso was May 21, 2007. (Tr.
722-25). He reported that he was feeling well and had no pain. (Tr.

---

[68] Augmentin is a medicine that combines amoxicillin, which
treats bacterial infections, and clavulnate potassium, which also
treats infection. Dorland's, supra note 3, at 65, 173, 362.

722). He indicated that he had missed a hematology appointment earlier in the month. (Id.). His most recent CD4 count was 1,047 and his most recent viral load was 95. (Tr. 581-82, 723). NP Carasso noted plaintiff's HIV was stable and that his WBC count remained elevated. (Tr. 723-24). A physical examination was unremarkable. (Tr. 723).

### 2.   Psychiatric Treatment

Plaintiff has been under the care of psychiatrist Dr. Scott Shapiro since May 2004. (Tr. 860-61). Since that time, he has met with Dr. Shapiro once every six weeks. (Id.).

Plaintiff first saw Dr. Shapiro on May 28, 2004. (Tr. 131-32, 300-01). Plaintiff complained that he had been depressed since 1996. (Tr. 300). He reported that he was sad every day, and that he had some crying spells over the loss of his friend. (Id.). He reported that he had suicidal ideation in the past but had not attempted suicide and did not currently have suicidal thoughts. (Id.). He also reported that a Dr. Jenkins had given him anti-depressants, which he had taken for two years.[69] (Id.).  He also

---

[69] There are no documents from a Dr. Jenkins in the record.

told Dr. Shapiro that he was gay, that he had been separated from his wife for nine years, and that his ex-lover had died in 1996. (Id.). He reported low levels of energy and trouble sleeping. (Id.). He indicated that his friend had given him some medication, but he did not know what it was. (Tr. 300). Dr. Shapiro noted that the medication may have been Klonopin.[70] (Tr. 132, 301). Plaintiff admitted that on the weekends he would drink eight to ten beers at a time and that he smoked a pack of cigarettes each day. (Id.).

Dr. Shapiro diagnosed plaintiff with neurotic depression and prescribed Effexor.[71] (Tr. 132, 300-01). Dr. Shapiro also prescribed Remeron[72] for plaintiff's sleep issues. (Tr. 132, 301).

Plaintiff returned to Dr. Shapiro on July 12, 2004. (Tr. 122-24, 288-90). He again complained of depression. (Tr. 122, 288). He indicated that his medications made him tired, that his mood and appetite were low, and that he had been feeling angry and very

---

[70] Klonopin is the informal name for clonazepam, an anti-convulsant. Dorland's, supra note 3, at 365, 947.

[71] Effexor is an antidepressant. Dorland's, supra note 3, at 570, 1953.

[72] Remeron, the commercial name for mirtazapine, is an antidepressant. Dorland's, supra note 3, at 1120; Tennenhouse, supra note 12, § 40:21.

irritable. (Id.). He said he slept only three hours a night and was tired during the day. (Id.). Dr. Shapiro noted that plaintiff had stopped taking his medications after two weeks. (Id.). Dr. Shapiro discontinued Effexor and Remeron. (Tr. 123, 289). He instead prescribed Risperdal[73] for plaintiff's anxiety and irritability. (Id.).

Plaintiff next saw Dr. Shapiro on August 9, 2004. (Tr. 278-80). Plaintiff reported that he was sleeping four hours a night. (Tr. 278). He also indicated that he had been very irritable and angry and that he was worried about his health. (Id.). He indicated that the Risperdal helped with his anger and irritability, but he believed that it caused tension in his shoulders. (Id.). He said that he was no longer taking medications from his friend. (Id.). Dr. Shapiro noted a slight improvement in plaintiff's appetite and depression. (Tr. 280). He diagnosed depression and prescribed Zyprexa[74] for depression and associated symptoms. (Id.).

Plaintiff's next visit with Dr. Shapiro was September 20,

---

[73] Risperdal is used as an "antipsychotic agent." Dorland's, supra note 3, at 1581.

[74] Zyprexa is used to treat manic or mixed episodes and general maintenance treatment in those with Bipolar I Disorder. PDR, supra note 44, at 4600-7910.

2004. (Tr. 268-70). Plaintiff reported that he was stressed and worrying a lot about not taking his HIV medications (per his doctor's orders). (Tr. 268). He was sleeping only three hours per night. (Id.). Plaintiff reported that his medications seemed to help his appetite and irritability. (Id.). However, plaintiff still reported irritability, and Dr. Shapiro noted that plaintiff became irritated during the visit when they discussed work. (Tr. 268, 270). Dr. Shapiro also noted that as the session progressed, plaintiff became detached, unwilling to engage in conversation, and maintained poor eye contact. (Tr. 270). Plaintiff also reported that he felt "a lot of anger at times on the inside." (Tr. 269). In addition, plaintiff reported passive suicidal ideation about a month prior. (Tr. 270). Plaintiff also informed Dr. Shapiro that he was attending group therapy at VCC three times per week and that he liked the people there. (Tr. 269).

Dr. Shapiro diagnosed plaintiff as depressed with a moderate risk of suicide, with related anxiety and chronic illness. (Id.). He prescribed Celexa[75] for plaintiff's mood. (Id.). Finally, Dr. Shapiro noted that plaintiff was waiting for disability, and they discussed plaintiff's employment options. (Id.).

---

[75] Celexa is an antidepressant used to treat major depressive disorder. Dorland's, supra note 3, at 305, 359.

Plaintiff returned to see Dr. Shapiro on November 10, 2004. (Tr. 257-59). Plaintiff reported that his mood was better, but that he was still suffering from anxiety and he felt anxious most of the time. (Tr. 258). He reported that his anger was moderately better, his appetite was better, and he had stopped drinking. (Id.). He also stated that he liked taking Zyprexa, which helped him sleep. (Id.). Dr. Shapiro also noted that plaintiff's mood and affect had improved. (Id.). Dr. Shapiro increased plaintiff's Celexa medication for residual depression. (Tr. 259). He also noted that plaintiff had applied for Social Security disability benefits and that his application had been denied. (Tr. 258). Finally, plaintiff told Dr. Shapiro that he was feeling comfortable in his meetings with a nurse at VCC. (Tr. 259).

On December 22, 2004 plaintiff told Dr. Shapiro that for the past three weeks he had been having "bad thoughts" at night, during which he felt as if he were outside of his body and could see himself being burned, sick, or dying. (Tr. 250). He said that these sights were not nightmares, because he remained awake during them, and that they made him anxious. (Id.). Plaintiff clarified that he was not "seeing things or hearing things," but rather seeing these images in his mind. (Id.). As a result, it was taking plaintiff a few hours to fall asleep, and he slept only two to three hours per

47

night. (Id.).  Dr. Shapiro planned to rule out the possibilities that plaintiff's "night images" were neurological or the result of his medication. (Id.). Dr. Shapiro also noted that plaintiff's high viral load could be affecting his thoughts and mood. (Id.). Plaintiff did not have thoughts of hurting himself. (Id.). Dr. Shapiro noted that plaintiff's mood was not too depressed. (Tr. 250). Finally, Dr. Shapiro decreased plaintiff's Celexa and increased his Zyprexa. (Id.).

Plaintiff next saw Dr. Shapiro on February 2, 2005. (Tr. 233-35). Plaintiff's mood, anxiety, and eye contact were all good. (Tr. 234). At this visit plaintiff reported for the first time that he suffered from mood swings four to five times per month. (Id.). These mood swings began after his friend died in 1996. (Id.). Plaintiff also told Dr. Shapiro that in his thirties he had begun to experience two- to three-day periods where his thoughts would race, he was easily distracted, he would spend "more" money, and he felt "more" irritable. (Id.). Dr. Shapiro diagnosed plaintiff with Type II Bipolar Affective Disorder with Rapid Cycling.[76] (Id.). He

---

[76] "Bipolar Disorders are characterized by mania and depression, which usually alternate." Merck, supra note 4, at 1713. "Type II Bipolar Disorder is defined by a history of at least one major depressive episode and at least one hypomanic episode." Id. Cycling refers to the time from "onset of one episode to that of the next," with rapid cycling usually defined as four or more episodes per year. Id.

prescribed Depakote and instructed plaintiff to continue taking Celexa and Zyprexa, despite plaintiff's complaints that the Zyprexa made him feel "too groggy" and "overly sedated" if taken in too large of a dose. (Tr. 234-35).

When plaintiff next saw Dr. Shapiro on March 17, 2005 he was noncompliant with his Depakote prescription because he had decided to restart Neurontin instead. (Tr. 225-26). Plaintiff complained that he was tired all the time, and he reported trouble listening to conversations and watching movies. (Id.). He also had difficulty concentrating when Dr. Shapiro asked him questions. (Tr. 225). Dr. Shapiro conducted an oral trials test, and noted that plaintiff had difficulty reciting the alphabet in English,[77] but had an easier time reciting it in Spanish. (Tr. 226). Dr. Shapiro suspected either minimal cognitive deficit of HIV or dementia, and he planned to rule out ADHD[78] and cognitive deficit. (Id.). He recommended an

---

[77] Plaintiff said "ABCDEFG KLMN." (Tr. 226). Dr. Shapiro noted that it was unclear if plaintiff was able to recite the entire alphabet, as he refused to continue. (Id.).

[78] ADHD stands for "attention-deficit hyperactivity disorder." Tennenhouse, supra note 12, § 5:3. "A diagnosis of Attention Deficit Hyperactivity Disorder . . . implies the presence of hyperactive-impulsive or inattentive symptoms that caused impairment and were present before age 7 years. The symptoms must cause clinically significant impairment, e.g., in social, academic, or occupational functioning, and be present in two or more settings, e.g., school (or work) and at home." PDR, supra note 44, at 6082-0300.

MRI, and noted that plaintiff's symptoms could be secondary to sleep deprivation or depression. (Id.). He referred plaintiff to a neurologist, increased plaintiff's Zyprexa, and started plaintiff on Ambien at night and Ritalin in the mornings. (Id.). Dr. Shapiro also noted that either he or plaintiff "filled out disability papers and gave consent." (Id.).

During his April 14, 2005 visit with Dr. Shapiro, plaintiff reported that his mood and energy level had improved. (Tr. 220). Dr. Shapiro reported that plaintiff's mood was "ok, so so," his affect was full, he was less irritable, his insight and judgment were moderate, and his concentration had improved since the last visit. (Id.). Dr. Shapiro continued to seek to rule out ADHD and cognitive deficit. (Id.).

Plaintiff next saw Dr. Shapiro on August 1, 2005. (Tr. 821-22). Plaintiff's mood was good. (Tr. 821). He reported that he had stopped taking the Ritalin because his mood had been "very good." (Id.). Plaintiff also reported that he was sleeping better, six to seven hours per night. (Id.). Dr. Shapiro noted that plaintiff's concentration was good, but that when he asked plaintiff questions, it appeared at times that plaintiff did not hear what he was saying. (Id.). Dr. Shapiro diagnosed plaintiff with Bipolar

50

Disorder and noted that he was doing well on his medications.
(Id.). Shapiro noted that plaintiff was attending VCC for exercise,
acupuncture, and massage, and that he did not want therapy at the
time. (Id.). Finally, plaintiff told Dr. Shapiro that he was dating
a new man who displayed suspect behavior, was only recently sober,
and used Xanax "from the street." (Tr. 821).

Plaintiff did not see Dr. Shapiro again until February 2,
2006. (Tr. 792-93). The record reflects that plaintiff's mood was
good. (Tr. 792). He reported that he had stopped taking his
medications four months prior because he was feeling better and
because the medications made him tired and suppressed his appetite.
(Id.). He told Dr. Shapiro that he only wanted medication for
sleep, but otherwise he did not wish to return to his medications.
(Tr. 792-93). Dr. Shapiro prescribed plaintiff Ambien. (Tr. 793).

After February 2, 2006, plaintiff did not see Dr. Shapiro
again for almost seven months. (Tr. 763). During his August 23,
2006 appointment, plaintiff reported feeling depressed for the
previous three months. (Id.). Plaintiff had not been shaving and
had suffered from some crying spells. (Id.). Dr. Shapiro noted his

51

concern for plaintiff's depression. (Id.). However, plaintiff refused medication and therapy. (Id.). Plaintiff did not want to take medication, even though it had helped in the past, because of its side effects, including suppressed appetite, weight loss, and "sedation." (Id.). Plaintiff also complained of "a lot of pain" from neuropathy in his feet. (Id.). Dr. Shapiro diagnosed plaintiff with Bipolar Disorder, ADHD, and possible mild cognitive deficits. (Id.).

Plaintiff next saw Dr. Shapiro on September 6, 2006. (Tr. 750-51). He complained of depression and indicated that his anxiety had gotten worse. (Tr. 750). He was still not taking his medication for fear of feeling "druggy [sic] or sedated." (Id.). Plaintiff noted that he had taken Zyprexa in the past, which had offered him some relief from his anxiety but had made him feel "too sedated." (Id.). Plaintiff reported that he was still experiencing painful neuropathy in his feet. (Tr. 751). Dr. Shapiro assessed plaintiff's mood as "depressed and anxi[ous]" and his affect as "sad, depressed." (Id.). Dr. Shapiro also reiterated his prior diagnoses of Bipolar Disorder, ADHD, and possible mild cognitive deficits.

(Id.). Dr. Shapiro prescribed lithium[79] for plaintiff's Bipolar Disorder. (Id.).

Plaintiff returned to Dr. Shapiro's office on October 18, 2006. (Tr. 747-48). He reported that he was feeling less depressed and that the lithium made him feel more relaxed and improved his thinking and concentration. (Tr. 747). Dr. Shapiro assessed plaintiff's mood as "depressed and anxi[ous]" and his affect as "anxious." (Id.). Dr. Shapiro continued to prescribe lithium and Ambien, and added a Wellbutrin prescription to improve plaintiff's depression and concentration. (Id.).

Plaintiff next saw Dr. Shapiro almost six months later on April 9, 2007. (Tr. 725-26). He indicated that he had stopped taking lithium three months earlier due to concerns that it elevated his WBC count. (Tr. 725). Dr. Shapiro doubted that the lithium had elevated plaintiff's WBC count because it remained elevated even after plaintiff discontinued lithium. (Id.). Plaintiff also reported that he was feeling irritable and cranky.

---

[79] Lithium is a metal used to treat the manic phase of bipolar disorder. Dorland's, supra note 3, at 1019.

53

(Id.).  Dr.  Shapiro's  examination  revealed  that  plaintiff  was
depressed and anxious. (Id.). He restarted plaintiff on lithium and
planned to monitor his WBC count. (Id.). Plaintiff continued to
refuse therapy despite Dr. Shapiro's strong encouragement. (Tr.
726).[80]


On May 25, 2007 plaintiff again visited Dr. Shapiro. (Tr.
721-22). He told Dr. Shapiro that he had been feeling irritable but
that he was doing a little better on the lithium and Welbutrin.
(Tr. 721). Dr. Shapiro noted that plaintiffs's mood was irritable
and his affect was cranky. (Id.). However, plaintiff felt "less
depressed." (Id.). Plaintiff also informed Dr. Shapiro that he had
been prescribed Percocet for back pain and neuropathy. (Id.). He
also mentioned that he would be traveling to Puerto Rico for two
weeks with a friend and that he was applying for disability. (Id.).
Dr. Shapiro continued to diagnose plaintiff with bipolar disorder,
ADHD, and possible mild cognitive deficit with anxiety. (Tr. 721).
He  increased  plaintiff's  lithium  and  continued  plaintiff's
Wellbutrin. (Id.).

---

[80] At this visit, plaintiff noted he had been in Puerto Rico
for a month two months prior. (Tr. 725).

On July 6, 2007 plaintiff told Dr. Shapiro that he was feeling very tired but that he was less irritable. (Tr. 720-21). Dr. Shapiro assessed plaintiff's mood as tired and his affect as "able to smile" and "no longer irritable." (Tr. 720). Plaintiff also indicated that he did not want to stop lithium completely but suggested a lower dose. (Id.). In response, Dr. Shapiro lowered plaintiff's lithium dosage. (Id.). Plaintiff also told Dr. Shapiro that he was sometimes having nightmares, and that he experienced three days of diarrhea in June during which he stopped eating. (Id.). At this visit, Dr. Shapiro also referred plaintiff to therapy at Talk Safe.[81] (Id.).


### 3.  Social Worker Reports


In addition to plaintiff's physical and psychiatric treatment, he regularly visited several social workers prior to and throughout the relevant time period. (Tr. 235, 240, 245-46, 261, 264-65, 285-86, 290-92, 296-98, 302, 305-12, 726-27, 730-31, 733-34, 738-41, 775-76, 780-81, 783-84, 787, 810, 827-29). Most regularly he

---

[81] Talk Safe offers counseling for HIV-negative and HIV-positive gay and bisexual men. See www.talksafe.org. There are no records of this therapy in the record.

visited SW Lawrence Miller. (Tr. 235, 240, 245-46, 261, 264-65, 285-86, 290-92, 296-98, 307-12, 726-27, 730-31, 733-34, 738-41, 775-76, 780-81, 783-84, 787, 810, 827-29). Generally during plaintiff's appointments with SW Miller, SW Miller provided generalized support and encouragement in addressing plaintiff's needs, with particular focus on plaintiff's psychosocial services through Bronx Aid Services and the VCC adult day health care program. (E.g., Tr. 240). To this end, SW Miller's reports often reiterate plaintiff's encounters with NP Carasso and Dr. Shapiro. Additionally, they provide accounts of the services and benefits that plaintiff received or was applying for and the treatment to which his other treating medical providers referred him. For example, on June 15, 2004, SW Miller assisted plaintiff in completing a Medicaid Threshold Application, to ensure that plaintiff would continue to receive services. (Tr. 298).

Plaintiff also occasionally discussed his employment, or lack thereof, with his social workers. During a September 20, 2004 visit with Dr. Miller, he and plaintiff discussed whether plaintiff might consider taking a computer class at VCC's adult program to obtain some job training. (Tr. 265). Plaintiff also spoke to a different

social worker, Geraldine Natwin, about his employment at several appointments. Plaintiff first told Dr. Natwin on April 20, 2004 that he had "quit [his] job due to stress and the pressure. [He] had been promoted to manager with more responsibility but no more pay. For six months [he] thought about quitting. The work was making [him] sick. Now [he] just wants to take [his] time and get [his] back better." (Tr. 306). During a May 4, 2004 visit with Dr. Natwin, plaintiff stated that he had worked long hours in his former position as a supervisor, which was very detrimental to his health. (Tr. 302). He told her that he was looking for a new job with less stress. (Id.).

### 4.   Opinions from the SSA's Consulting Physicians

On July 1, 2004 Dr. Herbert Meadow performed a psychiatric evaluation of plaintiff. (Tr. 116-17). Plaintiff reported that he was anxious at times and that he had no history of panic attacks, paranoia, or auditory or visual hallucinations. (Tr. 116). He told Dr. Meadow that he had thoughts of suicide following the death of his significant other in 1996, but that he had never attempted suicide and had not been suicidal since that time. (Id.). Dr.

Meadow's evaluation revealed that plaintiff suffered no psychomotor pathology. (Id.). Plaintiff made good eye contact, spoke coherently, appeared goal-oriented, and displayed no evidence of a thought disorder. (Id.). Plaintiff was oriented for time and place, his recent and remote memory were grossly intact, and he was of average intelligence. (Tr. 117). Plaintiff was mildly depressed and his affect was appropriate to thought content. (Tr. 116-17).

Dr. Meadow believed that plaintiff's psychiatric disorder would "not necessarily" interfere with his ability to function. (Tr. 117). He diagnosed plaintiff with mild to moderate Dysthymia.[82] (Id.) He also indicated that plaintiff should remain in psychiatric treatment and that his prognosis was "fair." (Id.). Dr. Meadow concluded that if plaintiff were "unable to work, it would be for physical reasons." (Id.).

Dr. Steven Rocker, an internal medicine specialist, evaluated plaintiff on the same date. (Tr. 118-20). Plaintiff complained of spinal stenosis, two dislocated discs, and low back pain that

---

[82] Dysthymia is a depressive disorder. Dorland's, supra note 3, at 559.

increased with standing or walking and radiated down his legs to his feet. (Id.). He was not in physical therapy at the time. (Id.). Plaintiff reported that he felt physically "regular" and had no complaints of fatigue. (Id.). Plaintiff said that he had suffered from depression since 1996 and that he was seeing a psychiatrist. (Id.). Plaintiff also denied suicidal ideation. (Id.).

Dr. Rocker's physical examination revealed that plaintiff: (1) had a normal station and gait; (2) had no difficulty transferring from a seated position on and off the examining table; (3) had full use of his hands in dressing and undressing; (4) showed normal grasp and manipulation in both hands; and (5) had full range of motion of the lumbosacral[83] spine and all joints without swelling, warmth or tenderness. (Tr. 119-20). Plaintiff's straight leg raise with his left leg elicited pain at 60 degrees, while his right leg showed no symptoms. (Id.). Plaintiff's most recent CD4 count was 600 and his most recent viral load was 7,738. (Tr. 118).

Dr. Rocker diagnosed plaintiff with low back pain, HIV

---

[83] Lumbosacral means "pertaining to the loins and the sacrum." Dorland's, supra note 3, at 1029.

disease, and a history of depression. (Id.). He believed that plaintiff suffered <u>no</u> limitations for hearing, speaking, sitting and handling; <u>possible</u> <u>slight</u> limitations for standing and walking; and <u>moderate</u> limitations for lifting and carrying. (Id.) (emphasis added). Dr. Rocker gave plaintiff a prognosis of "fair." (Id.).

II.  <u>Proceedings Before the SSA</u>

Plaintiff's first SSA benefits hearing was scheduled before ALJ Francis C. Newton on December 23, 2005. (Tr. 841-43). However, plaintiff was unable to attend due a transportation strike. (Tr. 843). Plaintiff's hearing was rescheduled for June 5, 2006, also before ALJ Newton. (Tr. 844-46).  Plaintiff appeared that day with non-attorney representative Prima Watkins. (Tr. 846). The hearing's audio ended shortly after the hearing assistant, Mr. Glen Gutzmore, introduced the case and the parties. (Id.). The hearing was then closed. (Id.).

On January 30, 2007 plaintiff appeared at a subsequent benefits hearing before ALJ Martha Reeves. (Tr. 869-78). Prima Watkins again accompanied plaintiff as a non-attorney

representative. (Tr. 869). Ms. Watkins indicated that this was the first time she and plaintiff had appeared together and that plaintiff's recent change of address had prevented them from speaking prior to the hearing. (Tr. 871, 873). In response to these facts, concerns that plaintiff required a Spanish interpreter, and non-development of the case file since 2004, ALJ Reeves rescheduled the hearing for a video-teleconference on February 27, 2007. (Tr. 871-74). Plaintiff also signed release forms as needed to develop the record. (Tr. 874-76).

On February 27, 2007 plaintiff attended the scheduled video-teleconference hearing with ALJ Reeves. (Tr. 879-89). After taking new exhibits into the record, ALJ Reeves asked if Ms. Watkins was prepared to question vocational expert Ruth Baruch, or if she preferred the ALJ to inquire. (Tr. 882). Ms. Watkins indicated that she did not receive prior notice that a vocational expert would be testifying. (Id.). ALJ Reeves confirmed that plaintiff and Ms. Watkins had failed to receive notice of the vocational expert because they had signed a date-certain agreement at the prior hearing. (Tr. 882-83). ALJ Reeves asked Ms. Watkins if she wanted to excuse the vocational expert and proceed with the hearing or

61

reschedule. (Tr. 883-85). Ms. Watkins and plaintiff spoke off of the record several times. (Tr. 883-84). Ultimately, plaintiff decided that he would prefer to reschedule an in-person hearing rather than continue the video-teleconference. (Tr. 885-87). The hearing was adjourned. (Tr. 889).

### A.   Plaintiff's Hearing Testimony

On May 9, 2007 plaintiff and his attorney,[84] Ufoma Abamwa, appeared at an SSA benefits hearing before ALJ Leonard Olarsch at which plaintiff testified about his past work history and present physical and mental conditions. (Tr. 847-68).

Plaintiff was born on May 16, 1964. (Tr. 851). He moved to the United States from Puerto Rico in 1991. (Tr. 854). While in the United States, he obtained a "GED." (Tr. 852). He was married but later informally separated from his wife. (Tr. 862). He had no children, and the rest of his family remained in Puerto Rico. (Tr. 862, 864). He stated that he was first diagnosed with HIV in 1995

---

[84] The ALJ's disability determination refers to Ms. Abamwa as a "non-attorney" representative. (Tr. 16).

(Tr. 854-55, 859), and that he became depressed as a result of that diagnosis. (Tr. 859). He lived alone on the fifth floor of an elevator building, took care of all his own household chores, including shopping, and walked to a neighborhood grocery store. (Tr. 862-63). Plaintiff also had friends with whom he would sometimes visit. (Tr. 863). Plaintiff is able to speak and read English. (Tr. 852, 861).

Plaintiff worked as a machine operator in a factory making shoulder pads for women's clothing from 1992 through 2004. (Tr. 852-54). His job involved standing and walking for many hours, and occasionally lifting and carrying objects weighing up to and over fifty pounds. (Tr. 853).

Plaintiff also said that he had a neuropathy that caused tingling, numbness, and pain in both feet and legs. (Tr. 855-56). He told the ALJ that he took Percocet every morning for the pain. (Tr. 856). The ALJ inquired whether plaintiff's back pain was the result of arthritis or plaintiff's HIV, and plaintiff responded

63

that it was the result of a fall at work in 1993.[85] (Tr. 856).
Plaintiff also explained that his back pain had gotten worse in
1998. (Tr. 853-55).

Plaintiff last worked as a machine operator in April 2004.
(Tr. 852-53). He told the ALJ that although he did continue to work
for a while with his back pain, he had left his job in 2004 for a
reason related to his HIV medications[86] and because it was "more
worse" and too painful for him to "stand and stay." (Tr. 855).

Plaintiff testified that he could no longer lift objects
weighing fifty pounds. (Tr. 857). He believed that he might be able
to lift objects weighing twenty pounds, but that he could carry
such objects only for short distances. (Id.). Plaintiff
additionally stated that he (1) could not sit for more than one
hour without his back hurting; (2) could walk five or six blocks

---

[85] At the same hearing, plaintiff also testified that this
fall occurred in 1994. (Tr. 854).

[86] The specific reason he gave was apparently inaudible on
the tape. (Tr. 855).

64